## COMMONWEALTH vs. WILLIAM FITZMEYER.

Suffolk. February 4, 1993. - March 10, 1993.

Present: LIACOS, C.J., ABRAMS, NOLAN, O'CONNOR, & GREANEY, JJ.

*Homicide. Evidence*, Cross-examination. *Practice, Criminal*, Argument by prosecutor, Instructions to jury. *Mental Impairment.*

The judge at a criminal trial correctly sustained the prosecutor's objection to a question propounded by defense counsel on cross-examination of a prosecution witness, where the question repeated one that the witness had already answered. [545-546]

At a murder trial, the prosecutor's reference in closing argument to a certain fingerprint was within the scope of the evidence and the inferences that could be fairly drawn from it [546-547], and her addressing the jury as "the community's collective conscience," for purposes of deciding whether the killing was committed with extreme atrocity or cruelty, was proper [547].

At the trial of a murder indictment arising from the death of a frail and very ill victim who had been beaten and strangled in his hospital bed, no substantial risk of a miscarriage of justice was occasioned by the lack of a jury instruction on involuntary manslaughter. [547-549]

At a murder trial, the defendant was not entitled to have the jury instructed that his mental impairment at the time of the crime should be considered in determining his culpability for first degree murder, where there was no evidence that any of his various medical conditions had diminished his knowledge of what he was doing or impaired his capacity to control his actions. [549]

The circumstances of a trial in which a defendant was found guilty of first degree murder by reason of extreme atrocity or cruelty presented no occasion for relief under G. L. c. 278, § 33E. [550]

INDICTMENT found and returned in the Superior Court Department on July 26, 1989.

The case was tried before *James D. McDaniel, Jr.,* J.

*Dana A. Curhan* for the defendant.

*Vincent R. McDonough*, Assistant District Attorney (*Mary K. Ames*, Assistant District Attorney, with him) for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant of murder in the first degree by reason of extreme atrocity or cruelty.[1] Represented by new counsel on appeal, the defendant argues that (1) the judge erred in limiting defense counsel's cross-examination of a prosecution witness on an issue that was important to the defense; (2) the prosecutor engaged in improper final argument; (3) the judge erred in failing to instruct the jury on involuntary manslaughter; and (4) the judge erred by declining to give a requested instruction on the issue of the defendant's mental impairment. The defendant also seeks relief pursuant to G. L. c. 278, § 33E (1990 ed.). We reject the defendant's claims of error, and also conclude that he should not receive relief under G. L. c. 278, § 33E. Consequently, we affirm the judgment of conviction.

The jury could have found the following facts. The elderly victim, ordinarily a nursing home resident, was a patient at the Winthrop Community Hospital on June 30, 1989. He was being treated for pneumonia and had been hospitalized for about a month. A prior stroke left him paralyzed on his right side, with only limited use of his left side, and with no use of his legs. The victim could not speak except to utter phrases such as "hey," or "what's up?" The victim could not ingest solid food and had to be fed Osmolite liquid through a feeding tube that had been surgically inserted into his stomach. The Osmolite was packaged in flip-top containers resembling soda cans. Up to six cans of Osmolite were kept on a table near the victim's bed. As needed, nurses would empty a can of Osmolite into the bag, and a pump would draw the liquid from the bag into the feeding tube.

---

[1] Two other indictments, charging the defendant with assault with intent to murder and assault and battery by means of a dangerous weapon, were not tried. After the defendant's sentencing on the murder conviction, these indictments were placed on file with the defendant's consent.

Before the defendant's arrival at the hospital, none of the attending nurses and nurses' aides noted anything unusual about the victim's appearance. A nurse indicated that the victim appeared "fine" to her. He had improved during his admission and was waiting to be transferred back to the nursing home. Shortly after 1 A.M. on the morning of July 1, 1989, the defendant was brought to Winthrop Community Hospital and was to share a room (room 201) with the victim. An attending nurse, Diane Bryson, initially cared for the defendant. Bryson noted that the defendant's hands and feet were filthy, that both his foot and knee were cut and that dried blood had formed in the area of the cuts. After cleansing the defendant's wounds, Bryson noted that there was no active bleeding anywhere on the defendant's body.

The defendant had been admitted for a seizure disorder and was given a dose of Dilantin on admission. He had sutures over one eye, and a bandage wrapped around his head. However, he showed no signs of neurological abnormalities. He was described by nurse Joy McNaughton, who conducted an initial medical assessment, as "alert and oriented" with no difficulty in speaking. His hand grasps were "strong and equal." The defendant did appear irritable, and wanted to sleep. McNaughton attempted to place a heparin lock for an intravenous tube on the defendant's left hand. When she failed to insert the device correctly, the defendant was caustic about her failure. Shortly after 2:30 A.M., the nighttime supervisor, Duane Hendrix, successfully inserted the heparin lock. There was no spillage of blood, and the area around the device was clean and dry.

During the defendant's admission procedure, the victim said "hey" a number of times. The defendant asked if the victim would keep him awake, to which an attending nurse responded that the victim would eventually settle down. After the defendant was admitted, Thomas Costigan, the hospital's transporter who had originally brought the defendant to room 201, was on the defendant's floor delivering laboratory reports. While there, Costigan answered two complaints from the defendant regarding the victim. The defendant first asked

Costigan if he could "shut up" the victim. The defendant, in a more irritable manner, repeated his request a second time ten minutes later. Costigan relayed both of the defendant's complaints about the victim to the attending nurses.

Sometime between 3:30 and 4 A.M., nurses Bryson and McNaughton saw the defendant walking down the hall in the area of rooms 218-219. When asked what he was doing, the defendant responded that the victim was keeping him awake and that he wanted a cigarette. The defendant was escorted back to his bed and the protective rails around the sides of his bed were raised. While in the room, a nurse checked on the victim. Apart from his noisy breathing, the victim appeared to be fine. The victim's oxygen tubing was properly attached, and there were no unusual marks on his face.

Shortly after 5 A.M., Bryson and a nurses' aide, Janet Nalen, beginning their rounds, entered room 201. The curtain separating the two beds had been drawn three-quarters shut and the lower rails on the defendant's bed had been put in the down position. While preparing to take the defendant's blood pressure, Nalen became aware that the victim's breathing sounded "raspy." She alerted Bryson, who proceeded to the victim's bedside. Bryson discovered that the victim's eyes were black and blue, his mouth was swollen, he had dents and lacerations on his head, his neck was bruised, and the oxygen tube had been wrapped around his neck. The victim appeared scared and was unable to give the nurses his usual "hey" greeting. A can of Osmolite on the victim's nightstand had blood on it. The victim was immediately brought to the emergency room. He died several days later.

The defendant was in his bed. Other than stating to Nalen when she entered the room that the victim had kept him up all night, the defendant made no inquiry about the victim. The defendant was observed to be smiling, and he acted "nonchalant." Head Nurse Anne Coutinho asked the defendant if he had inflicted the injuries on the victim. The defendant responded in the negative. Several of the nurses noticed blood on the defendant's right thumb and forefinger and on the edge of the gauze pad supporting the heparin lock. They

noted, however, that the area around the heparin lock was clean and dry. The nighttime supervisor, Hendrix, also did not observe any active bleeding on either of the defendant's hands.

The police were called and Costigan awaited their arrival in the defendant's room. In the interim the defendant stated: "[W]ouldn't it drive you crazy if you had to listen to that all night?" With the exception of the defendant's walk at approximately 4 o'clock that morning, none of the witnesses observed anyone other than hospital staff members in the hallways during the hours between 11 P.M. and 5 A.M.

Sergeant Frank Scarpa of the Winthrop police department arrived at the hospital at approximately 7 A.M. On observing the defendant, Sergeant Scarpa saw dried blood on the defendant's right hand. Sergeant Scarpa identified himself and read the defendant his Miranda rights. The defendant agreed to speak. He stated that no one other than the nurses had come into the room, and that he had gotten up only once to go to the bathroom. When Sergeant Scarpa asked the defendant if he hit the victim, the defendant responded that he had not hit the victim in the head. Sergeant Scarpa had not mentioned that the victim had sustained head injuries. Later (when he was being transported to his arraignment), the defendant told another police officer: "I wouldn't hurt the old man, but I take seizures, I hadn't taken my Dilantin and it makes me irritable."

Blood tests performed on the defendant's and victim's bed sheets and nightclothes proved to be inconclusive, although a sample taken from one of the victim's feeding cans proved to be human blood. Other evidence (namely, a partial fingerprint found on the top of an Osmolite can apparently used in the attack) did not match any of the defendant's fingerprints.

The medical examiner who had performed an autopsy on the victim testified about the extent of his injuries. The victim's neck injuries were consistent with manual strangulation which could have been accomplished by a garrote, a ligature, or bare hands. In the medical examiner's opinion, the victim's death was caused by blunt neck trauma. The victim,

who was in poor physical condition, could not have survived the trauma, although his injuries might not have been fatal to another.

1. *Limitation on cross-examination.* The problem concerning cross-examination arose in this way. The defendant's trial counsel anticipated that the prosecution would introduce testimony by Sergeant Scarpa of the defendant's statement that he had not caused the victim's head injuries and, based on the evidence, would argue that the defendant could not have known of the nature of the injuries unless he had caused them. The defendant's trial counsel asked Head Nurse Coutinho on cross-examination what the other nurse and nurses' aide who were in room 201 were saying when Coutinho was called to the room after the injured victim was discovered. Coutinho answered the question as follows: "I don't know what they [the other nurse and aide] were saying. When I walked in, there was a lot of explanations about, you know, what happened and what's going on, who did this."

The defendant's trial counsel repeated the question. The prosecutor's objection to the repeated question was sustained. A sidebar conference followed at which the defendant's trial counsel explained to the judge that he was trying to show that the defendant may have heard a nurse or aide talking about the victim's head injury so his knowledge of that fact when questioned by Sergeant Scarpa would not necessarily indicate his guilt. The judge questioned the relevance of the inquiry and stated that, in his view, the question called for hearsay. After discussion, the judge stood by his ruling sustaining the objection because the defendant's trial counsel could not state exactly what Coutinho would say in response to the question. The judge concluded that, without a specific offer of proof, the inquiry was "all speculation."

We reject the defendant's argument that the limitation imposed by the judge severely prejudiced the defense. We need not concern ourselves with the various grounds given by the judge for restricting the cross-examination. The response given by Coutinho to the initial question asked by the defendant's trial counsel indicates that she did not know ex-

actly what the nurse and aide were discussing beyond generalities pertaining to the incident. The second question, as to which the objection was sustained, repeated a question that had already been answered. It also appeared that the second question, if answered any differently, would involve speculation on Coutinho's part about the particulars of the discussion that was taking place when she entered the room. In the circumstances, the defense was not entitled to pursue the inquiry.

2. *The prosecutor's final argument.* The defendant focuses on two portions of the prosecutor's closing argument as follows.

(a) The defendant's theory at trial was that some unidentified third person had entered room 201 and attacked the victim while he and the victim slept. The defendant's trial counsel argued to the jury that the Commonwealth had not established beyond a reasonable doubt that this theory was not true and sought to bolster that contention by arguing that the fingerprint found on the Osmolite feeding can that apparently had been used in the attack was not the defendant's.

In response to the argument, the prosecutor reviewed the evidence showing that many people had handled the Osmolite can. She reminded the jury that there had been testimony that a fingerprint is not left each time an object is touched. She then stated that the fingerprint was found on the can's top along with blood. She inferred that the attacker would have had to grasp the can's bottom for the blood to be on the can's top. In her opinion, the attacker would not have left a fingerprint on the can's top. The prosecutor completed the inference, over objection, by saying that it was more likely that a nurse or hospital staff member had placed the fingerprint on the can during routine handling.

The defendant argues that this argument was unsupported by the evidence, amounted to speculation, and served to enflame the jury. We are satisfied that the prosecutor's comments were within the scope of the evidence and fair inferences that could be drawn therefrom. See *Commonwealth* v.

*Howe*, 405 Mass. 332, 335-336 (1989); *Commonwealth v. Atkins*, 386 Mass. 593, 605-606 (1982). Thus, the judge properly overruled the objection by the defendant's trial counsel to the remarks. *Commonwealth* v. *Lamrini*, 392 Mass. 427, 433 (1984).

(b) The defendant also complains of the prosecutor's argument urging the jury, as the "community's collective conscience," to find that the defendant had committed murder by extreme atrocity or cruelty based on the manner in which the killing occurred. The defendant further complains that the judge exacerbated the problem by telling the jury that, in deciding whether the killing had been committed with extreme atrocity or cruelty, they were "representatives of the consciences of the people of the community." No objection was made to the prosecutor's argument or the judge's instruction. Both were entirely proper. The jury represented the community's conscience in assessing whether the killing had occurred with extreme atrocity or cruelty. *Commonwealth* v. *Lawrence*, 404 Mass. 378, 393 (1989). *Commonwealth* v. *Atkins*, 386 Mass. 593, 600-601 (1982).

3. *Involuntary manslaughter.* The defendant did not request an instruction on involuntary manslaughter, but now argues that the judge should have instructed on the subject on his own.[2] We do not agree.

The law of the Commonwealth recognizes as involuntary manslaughter "a battery not amounting to a felony, when the defendant knew or should have known that the battery he was committing endangered human life." *Commonwealth* v. *Sires*, 413 Mass. 292, 302 n.10 (1992). See *Commonwealth* v. *Catalina*, 407 Mass. 779, 784 (1990). When it is obvious that the risk of physical harm to the victim creates a "plain and strong likelihood that death would follow," *Commonwealth* v. *Sires*, *supra* at 303, an instruction on involuntary manslaughter is not warranted. *Id.* The medical examiner

---

[2]The defendant's trial counsel did request an instruction on voluntary manslaughter which the judge denied. No argument is made that the denial of this request was improper.

testified that the victim, a frail and very ill man, sustained multiple injuries as the result of a beating. The examiner also testified that the victim was strangled with sufficient force to cause extensive surface and internal hemorrhaging in his neck area, to break bones in his neck and to produce bruising and swelling of his vocal cords.[3] The evidence indicated the attack was intentional and involved the kind of risk that could only lead to a finding of malice. "That is so because the [attacker] knew facts that a reasonably prudent person would have known, according to common experience, created a plain and strong likelihood that death would follow from the [beating and strangulation]." *Commonwealth* v. *Sires, supra* at 303. See *Commonwealth* v. *Nardone,* 406 Mass. 123, 132 (1989) (judge should not instruct jury on lesser offense not supported by reasonable view of evidence). The absence of a request for an instruction on involuntary manslaughter by the defendant's trial counsel (when instruc-

---

[3]The medical examiner testified that the blow or blows to the victim's head produced multiple injuries. There were multiple curved lacerations on the victim's forehead. These lacerations were between one-half and one and one-half inches long. There was swelling and bruising under both eyes that extended downwards between one and one and one-half inches. Inside the left ear there was bleeding that was consistent with trauma to that ear. A one-half inch laceration was situated over the cheekbone. There was a one-half inch bruise on the inner lip that was consistent with a force having struck the victim's mouth. A four inch bruise developed on the victim's left arm, and swelling appeared on his left hand. Two areas of hemorrhaging were visible on the victim's neck: three inches on one side, and four inches on the other. These areas were "purple red" in color. The medical examiner indicated that these areas were consistent with strangulation.

The medical examiner also indicated that bones in the victim's neck were fractured. These fractures were consistent only with manual strangulation. Additionally, the victim's neck muscles were hemorrhaged, bruised, and swollen. The swelling caused bone and cartilage structures to collapse, obstructing two life sustaining apparatuses: the breathing passages which were blocked by swollen vocal cords; and the carotid arteries. The swelling around the carotid arteries prevented oxygen from going to the brain, thereby creating irregular heartbeats. As previously indicated, the medical examiner concluded that the victim's death was caused by blunt neck trauma. We reject the defendant's argument that the opinion of the medical examiner as to the cause of death is flawed because he may not have considered the victim's pneumonia as a factor in the death.

tion on voluntary manslaughter was requested and denied, see note 2, *supra*) indicates that trial counsel was of the view that the evidence would not support a verdict of involuntary manslaughter. We conclude that the lack of an instruction on involuntary manslaughter does not create a substantial likelihood of a miscarriage of justice.

4. *Mental impairment.* The defendant claims that the judge erred in refusing his request to instruct the jury that evidence of his mental impairment at the time of the crime should be considered in determining his culpability for first degree murder. See *Commonwealth v. Freiberg*, 405 Mass. 282, 287, cert. denied, 493 U.S. 940 (1989); *Commonwealth v. Grey*, 399 Mass. 469, 470-471 (1987). In support of such an instruction, the defendant points to evidence that he had been admitted to the hospital after suffering epileptic seizures and after striking his head severely enough to fracture his cheekbone and require stitches; that he had been placed on Dilantin when admitted and a CAT scan had been ordered;[4] that his gait was unsteady and his temperature elevated; that he was under watch for possible alcohol withdrawal; and that Librium had been prescribed (but not administered until several hours after the incident).

The defendant was not entitled to the requested instruction because there was no evidence that any of the defendant's various medical problems had resulted in a condition which either diminished his knowledge of what he was doing or impaired his ability to control his actions. The judge correctly declined to instruct on a hypothesis which was unsupported by the evidence.[5] See *Commonwealth v. Egerton*, 396 Mass. 499, 504 (1986).

---

[4]The defendant also points to the evidence that he had told the police that he would not have hurt the old man if he had taken his Dilantin. As has been indicated, the evidence was that the defendant had received a 500 milligram dose of Dilantin when he was admitted to the hospital.

[5]The hypothesis was also inconsistent with the defense at trial that some third party had come into the room and committed the crime. See *Commonwealth v. Lazarovich*, 410 Mass. 466, 476 (1991) (where defense was that another had battered victim, defendant was not entitled to an instruction that battered woman syndrome might negate specific intent).

5. *Relief pursuant to G. L. c. 278, § 33E*. The judge instructed the jury on elements of murder in the first degree by reason of deliberate premeditation and extreme atrocity or cruelty and on the elements of murder in the second degree. The jury rejected the latter and specifically convicted the defendant of murder in the first degree on the basis of extreme atrocity or cruelty. Under G. L. c. 278, § 33E, the defendant seeks a new trial or a reduction of the conviction to second degree murder.

The evidence supported the jury's verdict. The victim was a defenseless man, physically frail and disabled, who was unable even to cry out for help. The medical evidence indicated that the killing was brutal, see note 3, *supra*, and that the victim lived for several days with his multiple injuries before dying.[6] In addition to the testimony describing the injuries, the jury had pictures of the victim's condition after the attack. The jury's verdict, that the murder was committed with extreme atrocity or cruelty, appears to reflect their outrage at the senselessness and heinousness of the crime. The defendant's background and circumstances bring nothing worthy of consideration. "In view of the viciousness of the crime, the fact that the defendant may have been [an alcoholic and ill] . . . does not move us to provide § 33E relief." *Commonwealth* v. *Gallagher*, 408 Mass. 510, 521 (1990). Justice requires that the verdict remain as entered.

*Judgment affirmed.*

---

[6] We reject the argument that the hospital's failure to treat the victim aggressively may have contributed to his death, thereby calling for a reduction in the verdict. There is no evidence to support this contention.