COMMONWEALTH *vs.* MICHAEL T. BURNHAM.

Plymouth. April 10, 2008. - May 27, 2008.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, & CORDY, JJ.

*Homicide. Witness,* Competency. *Evidence,* Conversation between husband and wife, Privileged communication, Declaration against interest. *Privileged Communication. Practice, Criminal,* Capital case, Instructions to jury. *Malice.*

A Superior Court judge properly denied the pretrial motion, brought by a defendant charged with murder in the first degree of a young child, to disqualify the defendant's former wife from testifying against him at his trial, where G. L. c. 233, § 20, First (which establishes an exception, in proceedings involving child abuse, to the general disqualification of one spouse from testifying as to private conversations with the other), applies to both civil and criminal proceedings [520-523], and where the conversations in question (i.e., the defendant's use of abusive or threatening words) were not private conversations [523].

The judge at a criminal trial did not err in excluding, as hearsay, a statement that the defendant's former girl friend gave to police, as well as a similar statement she made to a friend, where the statements were not against penal interest, in that they did not clearly tend to subject her to criminal liability such that a reasonable person in her position would not have made the statements unless she believed they were true, and in that they were not corroborated by circumstances that clearly indicated their trustworthiness; further, exclusion of the two hearsay statements did not prevent the defendant from presenting a defense. [523-526]

At the trial of an indictment charging the defendant with murder in the first degree, the judge properly declined to instruct the jury on involuntary manslaughter based on an unintentional killing resulting from a battery not amounting to a felony, where the manner of the attack (stomping twice on the stomach of a twenty-two month old child, the attacker each time twisting his or her weight onto the child's abdomen) would have informed a reasonable person that the stomping and twisting likely would cause only death, and where the fact that the child did not receive timely medical attention did not ameliorate the defendant's responsibility for inflicting lethal force. [526-528]

INDICTMENT found and returned in the Superior Court Department on June 6, 2002.

A motion to disqualify a witness was heard by *Carol S. Ball,* J., and the case was tried before *Linda E. Giles,* J.

*Carlo A. Obligato*, Committee for Public Counsel Services, for the defendant.

*Gail M. McKenna*, Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant was convicted of murder in the first degree by extreme atrocity or cruelty. On appeal he asserts error in the admission in evidence of details of a private conversation between him and his wife, the exclusion of a declaration against penal interest made by the codefendant, and the failure to charge the jury on involuntary manslaughter. We affirm the conviction and decline to grant relief under G. L. c. 278, § 33E.

1. *Background.* Rachelle Pelletier was born May 30, 1983. She was pronounced dead shortly after 3 P.M. on March 7, 1985, at Brockton Hospital after efforts to resuscitate her in the emergency room had failed. The Commonwealth's pathologist determined that the cause of death was peritonitis secondary to a traumatically severed small bowel. He opined that the bowel was severed when it was pressed and rotated or twisted against the spinal column, which must have been supported by a hard object, such as a floor. He explained that, based on the amount of bleeding at the level of the kidneys and rectum, the object that struck the child had to be much larger than a fist. He testified that the injury was consistent with an adult stomping on the child's stomach while she was lying on the floor, then twisting the foot while it was pressing on her abdomen. The pathologist opined that the injury was inflicted the night before she died.

The child had further injuries, including recent bruises on her left forehead, her right cheek, and her chin; an abrasion of her upper lip; and bruises on her left shoulder, her abdomen, and her right thigh. She also had two recently broken ribs on the left side of her back. Her stomach was distended and rigid to the touch when she arrived at the hospital.

Rachelle had last lived with her mother (Margaret Earle), the defendant (Earle's boy friend), and Raymond Gaffney (Earle's cousin) in an apartment her mother had rented at 89 Highland Street in Brockton. On March 6, 1985, at 5:30 P.M., the night before Rachelle died, the defendant, Earle, and Rachelle were eating dinner, and Rachelle appeared fine and unbruised. Gaffney left while they had dinner. At about 9 P.M. that evening,

Earle visited an upstairs neighbor, Susan Lewis, to celebrate Earle's twenty-first birthday. The defendant babysat Rachelle. Shortly after Earle's arrival, Lewis's thirteen year old daughter, Colleen, went downstairs to Earle's apartment to get a drinking glass. The defendant was holding Rachelle in his arms but her face was turned away from Colleen's view. Rachelle was crying hysterically.

Gaffney returned to the apartment at about 9:30 P.M. The defendant was babysitting alone for Rachelle, an unusual arrangement. He was upset that Earle was upstairs celebrating and that he had to babysit. The defendant was holding Rachelle, who usually went to bed at 8 P.M., but was fully dressed and "out cold." Gaffney could not see her face. The next morning, at about 5:30 or 6 A.M., Gaffney heard Rachelle crying louder than he had ever heard. She was standing in her crib. He laid her down, changed her diaper, and gave her a bottle. He noticed that her color was "bluish green." The light was otherwise too dim for him to see if she had any bruises. Gaffney woke the defendant, and within fifteen minutes they left for work.

At about 11 A.M., Colleen Lewis briefly visited Earle's apartment. Rachelle lay on the sofa, moaning. Her color was yellowish and she had a bruise on one side of her face. Colleen returned to the apartment at about 2 P.M. to babysit. Earle left shortly thereafter. Rachelle was still on the sofa, moaning. She had spit up a mucous-like substance. Colleen checked on Rachelle a few minutes later and found she was not breathing. Colleen rolled her over, and a yellowish-green substance oozed from her mouth. Colleen screamed for her mother, who came downstairs and started cardiopulmonary resuscitation. The police were called, and they arrived in minutes.

The investigation remained open for approximately seventeen years. Earle, Gaffney, and the defendant all were suspects. There was evidence that all three had physically and emotionally abused Rachelle. Each had been alone with the child during the approximate range of time that her small bowel had been severed. No one made any admissions. Earle and the defendant maintained their relationship for several years thereafter and had a child.

On December 24, 1993, the defendant met Ruth Harvey in a bar in Brockton. They were married on July 5, 1994, and moved

to Virginia the following year. On December 30, 1995, after drinking all day, they argued and the defendant hit her. She tried to telephone police. The defendant threatened that if she telephoned the police he would kill her. He said he had killed someone else. He told her he was babysitting Rachelle while Earle was out celebrating her twenty-first birthday. Angry about babysitting, Rachelle's crying made him more angry. He picked her up, threw her on the floor, then stomped on her stomach first with one foot, then the other. Each time he twisted his foot into her stomach. He threatened to kill his wife if she told anyone. She was terrified.

The defendant and his wife moved to Attleboro around January, 1996. They continued their excessive drinking, which frequently led to violence and threats by the defendant. He repeatedly threatened to kill her, as he had killed Rachelle. While the defendant and his wife lived together, she tried unsuccessfully several times to contact the officer investigating Rachelle's death. Their relationship eventually ended around August, 1996.

On November 19, 2001, the defendant dialed 911 from a public telephone in Brockton and admitted committing a murder at 89 Highland Street. The tape recording of the telephone call was played to the jury. He then told a stranger he wanted to turn himself in for murder. In early 2002, the defendant made various inculpatory statements in the context of a batterers' group. He also made an inculpatory statement to a probation officer in April, 2002.

An arrest warrant naming the defendant for the murder of Rachelle issued May 3, 2002. Following an extensive manhunt he was found July 22, 2002, hiding in a crawl space in a house in Holbrook.

2. *Spousal disqualification.* The defendant timely moved, pursuant to G. L. c. 233, § 20, First, to disqualify his former wife from testifying against him. The judge denied his motion on the ground that the marital disqualification does not apply to proceedings involving child abuse. The defendant argues this was error because the exception in § 20, First, for proceedings involving child abuse is limited to civil proceedings.

General Laws c. 233, § 20, First, states:

"*Any person* of sufficient understanding, although a

party, *may testify in any proceeding, civil or criminal*, in court or before a person who has authority to receive evidence, *except as follows*:

"First, Except in a proceeding arising out of or involving a contract made by a married woman with her husband, a proceeding under [G. L. c. 209D] and in a prosecution begun under [§§ 1-10], inclusive, of [G. L. c. 273], any criminal proceeding in which one spouse is a defendant alleged to have committed a crime against the other spouse or to have violated a temporary or permanent vacate, restraining, or no-contact order or judgment issued pursuant to [§ 18, 34B, or 34C] of [G. L. c. 208], [§ 32] of [G. L. c. 209], [§ 3, 3B, 3C, 4, or 5] of [G. L. c. 209A], or [§ 15 or 20] of [G. L. c. 209C], or a similar protection order issued by another jurisdiction, obtained by the other spouse, *and except in a proceeding involving abuse of a person under the age of eighteen, including incest, neither husband nor wife shall testify as to private conversations with the other*" (emphasis added).

The general principle articulated at the beginning of § 20 is that any person may testify in any proceeding. It expressly treats civil and criminal proceedings alike. The exceptions to the general principle are set forth in four numbered paragraphs that constitute the bulk of § 20. The thrust of the defendant's argument is that the Legislature created distinctions between civil and criminal proceedings in the exceptions to the general principle that determine the manner in which the statute as a whole must be read. It did so, he contends, by specifying criminal proceedings as such, and by referring to civil proceedings simply as "proceedings." We disagree.

The import of the specific language of the general principle is that a "proceeding" means either a civil or a criminal proceeding. Applying the canon of statutory construction that words used in one part of a statute to connote a particular meaning should be given the same meaning in another part of the same statute, *Beeler* v. *Downey*, 387 Mass. 609, 617 (1982), the word "proceeding," when used without limitation in the body of exceptions to the general principle, means either a civil or criminal proceeding. The defendant's argument to the contrary is based on a misunderstanding of three exceptions set forth in the first clause of § 20. We turn to those exceptions.

First, the defendant argues that the exception for "a proceeding arising out of or involving a contract made [between spouses]" refers to a civil proceeding. This is not necessarily so. Any number of criminal proceedings that "involve" a contract between spouses come to mind. For example, a crime may be committed during the performance of a contract between spouses who own separate businesses. "Proceeding," unmodified in this exception, refers to both civil and criminal proceedings.

Second, the exception for a "proceeding under [G. L. c. 209D]" is not necessarily civil, as the defendant contends. General Laws c. 209D, § 3-305 (*b*) (5), authorizes enforcement of orders "by civil or *criminal* contempt," and criminal contempt is a criminal proceeding (emphasis added). See *Commonwealth v. Gallarelli*, 372 Mass. 573, 579 (1977). See also *Bloom* v. *Illinois*, 391 U.S. 194, 201 (1968) (defendant entitled to jury trial on charge of criminal contempt depending on length of sentence sought); Mass. R. Crim. P. 44, 378 Mass. 920 (1979). The Legislature also contemplated criminal sanctions for violations of G. L. c. 209D when it added "fail[ure] to comply with an order or judgment for support" under G. L. c. 209D to the list of felonies punishable under G. L. c. 273, §§ 15 and 15A, in the same legislation that first introduced G. L. c. 209D. See St. 1995, c. 5, §§ 87, 99-102. The Legislature further contemplated the criminal aspects of G. L. c. 209D by authorizing certain entries in "computer systems for criminal warrants," G. L. c. 209D, § 3-305 (*b*) (9), and by authorizing rendition proceedings for individuals "charged criminally in the commonwealth with having failed to provide for the support of an obligee." G. L. c. 209D, § 8-801 (*b*) (1).

Third, and finally, the exception under G. L. c. 233, § 20, First, for proceedings "involving abuse of a person under the age of eighteen, including incest," contemplates both civil and criminal proceedings. This is true if only because incest is a crime. G. L. c. 272, § 17.

We conclude that the word "proceeding," when appearing without limitation in G. L. c. 233, § 20, connotes both civil and criminal proceedings. Whenever the Legislature chose to limit the meaning of "proceeding" in § 20, it did so with a modifier, such as the word "criminal," or by identifying specific types of

proceedings, including, for example, a "prosecution begun under [G. L. c. 273, §§ 1-10]"; a violation of G. L. c. 208, § 18; and a "grand jury" proceeding.[1]

The judge also was correct to deny the defendant's motion to disqualify his former wife from testifying where the conversations in question were not "private conversations." Private conversations between spouses under the common-law rule governing spousal disqualification as well as under § 20[2] do not include abusive or threatening words, which are involved here. Abusive or threatening words directed at one's spouse do nothing to promote marital harmony, the purpose behind the protection. See *Commonwealth* v. *Gillis*, 358 Mass. 215, 217-218 (1970); *Commonwealth* v. *Cronin*, 185 Mass. 96, 97 (1904), citing *French* v. *French*, 14 Gray 186 (1860). There was no error.

3. *Statements against penal interest.* The defendant asserts error in the exclusion of Earle's statement to a detective that on the morning of March 7, 1985, the day Rachelle died, she changed Rachelle's diaper and did not see any bruises on her. Also excluded was a similar statement Earle made to a friend, with a

---

[1] A similar result is reached with respect to the exceptions in the second, third, and fourth clauses of G. L. c. 233, § 20, which state:

"Second, Except as otherwise provided in [G. L. c. 273, § 7,] and except in any proceeding relating to child abuse, including incest, neither husband nor wife shall be compelled to testify in the trial of an indictment, complaint or other criminal proceeding against the other;

"Third, The defendant in the trial of an indictment, complaint or other criminal proceeding shall, at his own request, but not otherwise, be allowed to testify; but his neglect or refusal to testify shall not create any presumption against him.

"Fourth, An unemancipated, minor child, living with a parent, shall not testify before a grand jury, trial of an indictment, complaint or other criminal proceeding, against said parent, where the victim in such proceeding is not a member of said parent's family and who does not reside in the said parent's household. For the purposes of this clause the term 'parent' shall mean the natural or adoptive mother or father of said child."

[2] General Laws c. 233, § 20, modified the common-law rules involving spousal privilege and spousal disqualification, but it did not alter the meaning of "private conversations." See *Commonwealth* v. *Maillet*, 400 Mass. 572, 575 (1987).

request not to talk to police. The judge excluded the statements as hearsay, confusing, and lacking substantial probative value. The defendant had argued below that the statements should be admitted not for the truth of the matter asserted, but because the statements were made and, he added, because they were false. He now argues for the first time on appeal that the statements were admissible as statements against penal interest.

Hearsay is admissible if it is a statement against penal interest. A statement is against penal interest if (1) the declarant is unavailable to testify, (2) the statement so far tends to subject the declarant to criminal prosecution that a reasonable person in the declarant's position would not have made the statement unless he believed it to be true, and (3) if offered to exculpate the accused, it is corroborated by circumstances clearly indicating its trustworthiness. *Commonwealth* v. *Carr*, 373 Mass. 617, 623 n.9 (1977). All three requirements must be met.

The Commonwealth contends the defendant never called Earle to testify at his trial, and we should not presume that she would have invoked her privilege against self-incrimination, see *Commonwealth* v. *Lopera*, 42 Mass. App. Ct. 133, 137 n.3 (1997), and thereby establish her unavailability. See *Commonwealth* v. *Galloway*, 404 Mass. 204, 208 (1989). The defendant contends Earle was unavailable to testify at his trial because she exercised her privilege against self-incrimination before the grand jury; she was indicted with the defendant for Rachelle's murder; her trial was severed from that of the defendant and she was tried first; she did not testify at her trial; she was convicted of murder in the second degree; and she appealed from her conviction. In these circumstances, it is likely Earle would have invoked her privilege under the Fifth Amendment to the United States constitution, and it is appropriate to conclude that the unavailability requirement has been satisfied. See *Commonwealth* v. *Charles*, 428 Mass. 672, 679 (1999).

Earle's statements do not satisfy the second test for admissibility as a statement against penal interest. That is, they did not clearly tend to subject her to criminal liability such that a reasonable person in her position would not have made the statements unless she believed they were true. Such statements must "be truly against the declarant's penal interest." *Commonwealth* v. *Carr*, *supra* at 624.

Although the statements could be construed as Earle's consciousness of guilt, they are equally suggestive both of Earle's belief that the defendant harmed Rachelle and Earle's intention to provide cover for him so she could continue a relationship with him. Their relationship did continue several years after Rachelle's death. In addition, the judge reasonably could have concluded that Earle's statements were intended to cast blame on her thirteen year old upstairs neighbor, Colleen, who was babysitting Rachelle and was present when she stopped breathing. A statement against penal interest need not contain a direct admission of guilt, see *Commonwealth* v. *Drew*, 397 Mass. 65, 74 (1986), but Earle's statements make no assertion of criminal activity whatsoever, and they contain no details that are clearly inculpatory. Whatever value they may have as statements against penal interest derive from their brimming ambiguity. The defendant even argues that she was either lying or telling the truth. As such, the statements are not "truly against the declarant's penal interest." *Commonwealth* v. *Carr, supra.* In the context of this case, where the defendant contends that Earle's statements were admissible on the question whether she, and not the defendant, inflicted the injuries that caused Rachelle's death, we conclude that the statements lack sufficient probity and therefore do not so far tend to subject Earle to criminal liability as is necessary to be admissible under this exception to the hearsay rule. *Id.* at 623.

Under the third element of proof, because Earle's statements were offered to exculpate the defendant, they must be corroborated by circumstances clearly indicating their trustworthiness. *Commonwealth* v. *Carr, supra.* In making this determination a judge should consider certain factors " 'in light of the other evidence already adduced or to be adduced,' including the credibility and reliability of the declarant and the credibility and probative value of the statement; the timing of the declaration; the relationship between the witness and the declarant; whether the statement was heard by others; whether the statement was made spontaneously; whether and in what circumstances the statement was repeated; and whether there was a motive for the declarant to misrepresent the matter." *Commonwealth* v. *Morgan*, 449 Mass. 343, 355 (2007), quoting *Commonwealth* v. *Drew*,

*supra* at 75-76. Applying these factors, we conclude that the judge would have been warranted in deciding that the circumstances did not clearly support a finding of trustworthiness. One statement was elicited in response to police questioning; it was not spontaneous. Both statements were ambiguous and therefore do not necessarily serve their intended purpose of exculpating the defendant. As stated, Earle had a strong motive to hide the truth to protect her relationship with the defendant, and her interests were intertwined firmly with his, especially where their relationship lasted several years.

Because the defendant has failed to satisfy the second and third elements to establish that Earle's statements were made against her penal interest, the judge would have been warranted in excluding Earle's statements if they had been offered as such.

The defendant combines this argument with a claim that the judge's ruling denied him the right to present a defense, in particular, evidence that Earle had inflicted on Rachelle the injury that caused her death. The defendant was not prevented from presenting a defense that Rachelle was killed by Earle. He was allowed to present considerable evidence of Earle's abuse of Rachelle. The judge correctly excluded the two hearsay statements in question. A defendant has no "constitutional right to the admission of unreliable hearsay." *Commonwealth* v. *Evans*, 438 Mass. 142, 156 (2002), cert. denied, 538 U.S. 966 (2003). See *Commonwealth* v. *McAfee*, 430 Mass. 483, 489-492 & n.3 (1999).

4. *Manslaughter instruction.* The defendant contends that the evidence taken in the light most favorable to him, *Commonwealth* v. *Schnopps*, 383 Mass. 178, 179 (1981), *S.C.*, 390 Mass. 722 (1984), required the judge to instruct the jury on involuntary manslaughter based on an unintentional killing resulting from "a battery not amounting to a felony, when the defendant knew or should have known that the battery he was committing endangered human life." *Commonwealth* v. *Sires*, 413 Mass. 292, 302 n.10 (1992). The evidence on which he relies includes the following. The medical examiner testified that the severed bowel injury was not fatal, and had Rachelle been taken to the hospital within eight hours, or even more, she

probably would not have died. In addition, according to the pathologist a "moderate degree of energy" was all that was required to sever Rachelle's bowel.[3]

The defendant argues that this case is controlled by *Commonwealth* v. *Vizcarrondo*, 427 Mass. 392, 393, 397 (1998), *S.C.*, 431 Mass. 360 (2000), where we said that evidence of at least four blows to the body of a ten month old child resulting in injuries that included fractured ribs and a lacerated and crushed liver "could be viewed either as tending to prove a strong and plain likelihood of death or as tending to prove conduct that involved a high degree of likelihood that substantial harm will happen to another." See *Commonwealth* v. *Woodward*, 427 Mass. 659, 670 (1998) ("Although evidence of a single blow to a child of tender years may be sufficient to support a jury finding of malice . . . such an inference is not *necessarily* required by evidence even of repeated blows to a young child" [emphasis in original]). Only "[w]hen it is obvious that the risk of physical harm to the victim creates a 'plain and strong likelihood that death would follow' . . . [is] an instruction on involuntary manslaughter . . . not warranted." *Commonwealth* v. *Fitzmeyer*, 414 Mass. 540, 547 (1993), quoting *Commonwealth* v. *Sires*, *supra* at 303.

Although the Commonwealth's pathologist testified that a moderate amount of force was all that was required to sever the bowel, he did not testify that moderate force was all that was used here. The medical examiner testified that the type of internal injuries he witnessed at the autopsy indicated "a tremendous, tremendous force" was applied to the child's abdomen, comparable to "a Mike Tyson type of power."[4]

To the extent that the defendant was the person who inflicted these injuries on Rachelle, the only evidence descriptive of the batteries he inflicted was that he threw her on the floor and stomped on her stomach twice, each time twisting his weight onto her abdomen.[5] Based on the pathologist's testimony con-

---

[3]It is significant to our discussion that the pathologist simultaneously said it would take "[a] lot less [energy] than it would take to produce such an injury in myself. Any adult has a better musculature. And an infant this age, certainly the musculature is not very well developed."

[4]Mike Tyson was a world heavyweight boxing champion.

[5]We do not consider the testimony of the pediatrician/emergency room

cerning the mechanics of how the bowel was torn, the fact that Rachelle was thirty-two inches tall and weighed only twenty-two pounds, and the fact that her musculature was not well developed, the jury could have inferred the defendant must have felt the child's spine under his feet as he stomped and twisted, and it should have been obvious to him that the application of this type of force against the unprotected viscera of this twenty-two month old child necessarily would cause internal injuries that created a plain and strong likelihood that death would follow. Unlike the blows inflicted in the *Vizcarrondo* case, which were directed at the child's rib cage, the stomping and twisting blows inflicted here were directed at the child's abdomen (which had little muscle mass) and her unprotected internal organs. The manner of the attack would have informed a reasonable person that the stomping and twisting likely would cause only death. The massive assault on this fragile[6] and vulnerable child did not warrant an involuntary manslaughter instruction. It only warranted a finding of malice. See *Commonwealth* v. *Fitzmeyer, supra* at 548 (extensive beating of elderly man did not warrant manslaughter instruction).

The fact that the child did not receive timely medical attention does not ameliorate the defendant's responsibility for inflicting lethal force. *Id.* at 548 n.3. *Commonwealth* v. *Medina*, 380 Mass. 565, 573 (1980).

5. *G. L. c. 278, § 33E.* We have reviewed the entire record, the transcript and the briefs, and decline to reduce the degree of guilt or order a new trial.

*Judgment affirmed.*

---

physician called by the defendant to testify. He opined that she was struck by a fist, not stomped on by shod feet. He had not been aware that her small bowel had been severed. This was offered in support of the theory that Earle caused Rachelle's death. The only type of blow admitted by the defendant was the stomping and twisting, and for purposes of our analysis we must determine what a reasonable person inflicting that type of force should have known.

[6]There was evidence Rachelle had become sickly after the defendant moved into the apartment, relegating her to an unheated pantry. Since October 16, 1984, until her death, she gained no weight (she weighed twenty-two pounds), indicating a failure to thrive.