Jose LUCAS, Appellant,

and

Lexton Pellew, Appellant,

v.

UNITED STATES, Appellee.

Nos. 08–CF–1108, 08–CF–1165.

District of Columbia Court of Appeals.

Argued April 1, 2011.

Decided May 26, 2011.

Matthew C. Leefer, Boonsboro, MD, appointed by the court, for appellant Lucas.

David R. Solomon, with whom Harold I. Glaser, Baltimore, MD, was on the brief, for appellant Pellew.

Patricia A. Heffernan, Assistant United States Attorney, with whom Ronald C. Machen, Jr., United States Attorney, and Roy W. McLeese III, Chrisellen Kolb, Timothy Lucas, and Amy Zubrensky, Assistant United States Attorneys, were on the brief, for appellee.

Before THOMPSON, Associate Judge, KRAMER, Associate Judge, Retired,* and NEBEKER, Senior Judge.

* Judge Kramer was an Associate Judge of the court at the time of the argument. Her status changed to Associate Judge, Retired, on May 1, 2011.

THOMPSON, Associate Judge:

A jury convicted appellants Jose Lucas and Lexton Pellew of several offenses in connection with the robbery of a Georgetown jewelry store in August 2006.[1] On appeal, they argue that an *ex parte* discussion between the court, the prosecutor, and a government witness's attorney violated their Sixth Amendment rights to counsel and to confront witnesses and their due process right to be present during trial, and also that the evidence was insufficient to support their convictions. Appellant Pellew contends in addition that the government improperly elicited testimony regarding his silence upon arrest and that he was prejudiced by the admission of certain hearsay statements. We affirm.

## I.

On August 20, 2006, a group of men entered the jewelry store, ordered two employees and store owner Moshe Motai to the floor, stole jewelry and money, and shot Motai in the abdomen. Two men, Makonnen Romney and Chuka Ezeokoli, were linked to the crime after they were arrested in December 2006 for robbing a jewelry store in New Jersey. Along with another man (Damian Hamilton), Romney and Ezeokoli eventually entered into a plea agreement with the government. Pursuant to that agreement, they testified at appellants' trial, and told the jury that they and appellants, all of whom lived at the time in Brooklyn, New York, had participated in the Georgetown robbery. Romney testi-

fied that he and Ezeokoli had planned the robbery for approximately one week to a month and had been to the store on two previous occasions. On the morning of the robbery, Romney drove to meet up with his friend Hamilton, and then moved to the backseat of the car. Hamilton then drove the car a few blocks to Lucas's home to pick up appellants, who were friends of Ezeokoli. Lucas brought a navy-colored nylon bag with him. Hamilton then drove the four to the District without knowing the group's final destination.[2] During the trip, everyone mostly slept and no discussion took place. After arriving in Georgetown, Romney called Ezeokoli, who had come from Brooklyn by bus, to meet the group. When Ezeokoli arrived, he got inside the car and he and Romney began to have a conversation about the jewelry store. Ezeokoli started talking about a "specific ... casing inside the ... store." Then, according to Hamilton, "we proceeded to kind of have a conversation about who would go into the store and who would stay outside...." From the conversation, Hamilton deduced that Romney would go into the store and Ezeokoli would be a look-out. Although Hamilton did not know what appellants' roles were, Romney testified that appellants were supposed to go into the store "to suppress the clerks" while he would focus on taking the jewelry. After the brief discussion, Ezeokoli exited the car and Lucas began to pass out items from the bag he brought with him, including a mask and gloves to Romney and a gun to Pellew. Lucas and Pellew then

---

**1.** Both appellants were found guilty of conspiracy to commit armed robbery, second-degree burglary while armed, threatening to injure a person, kidnaping while armed, armed robbery, possession of a firearm during a crime of violence ("PFCV"), carrying a pistol without a license ("CPWL"), possession of an unregistered firearm ("UF"), and unlawful possession of ammunition ("UA").

Pellew additionally was found guilty of aggravated assault while armed and a related count of PFCV.

**2.** Hamilton had been told by Romney that they were going to the District to "party[,]" and did not know that there was a plan to rob a jewelry store.

exited the car, while Romney remained for a moment to ensure that Hamilton would stay as their get-away driver.

Events inside the store were described by its employees. Salesman John Demetro testified that a person armed with a gun entered the store and told Demetro to "[g]et on the floor." Demetro immediately complied, but could tell from the number "of footsteps" that there were multiple robbers in the store. Yahya Alaramrani, the store's jeweler, who had been in the back of the store, walked to the front room, where he was told to get down. Both employees' wallets were taken. Demetro and Alaramrani "heard a crash, like a showcase [had been] broken" and a "gunshot." Motai was in the back office when he saw "a guy in front of [him] with a gun in his hand, [who] put it in [Motai's] face, and said, 'Get down.'" The gunman then went into the safe, which was located in the office and contained cash and jewelry. When the gunman saw that Motai was watching him, he pulled Motai's shirt over his head. The gunman told Motai, "If you talk too much, I will shoot you right now, and you're never going to breathe again." The gunman then shot Motai in the stomach.

Romney testified about the conspirators' actions at the store. Ezeokoli, with whom Romney stayed in continual contact by cell phone, "ma[d]e sure that the outside was clear and no one was coming into the store, [and kept] an eye out for officers." Pellew, who had the gun, made sure that "the clerks were suppressed .... [and] he was just making sure that the clerks didn't move while [Romney] was looking for the keys to get into the case that [Romney] originally planned on going into." Lucas, according to Romney, was "coming in and out [of] the store just letting [Romney] know that ... everything outside is all right[ ] and ... walking around." Unable to open the display case, Romney walked to the back of the store where Pellew "was standing by the safe.... So when [Romney] came back there, [Pellew] had passed [him] the tray that was in there, and that's the stuff that [Romney] put all in the bag." Romney then returned to the jewelry case at the front of the store, broke it using a metal object Pellew handed to him, and took the case's contents. Romney then "heard a shot .... [a]nd ... ran out [of] the store." After Romney, Lucas, and Pellew returned to the car, Hamilton drove the four back to Brooklyn.

Ezeokoli and Romney identified themselves and Lucas and Pellew from a video recorded from the store's surveillance system.

## II.

### A.

■ The government's direct examination of Ezeokoli began on the first day of trial. On the second day of trial, just before the resumption of Ezeokoli's direct examination, Ezeokoli's attorney, Ms. Harvey, asked if she could approach "with ... Government counsel." When the court agreed, Harvey said she had learned that, after trial ended the previous day, Ezeokoli was transported back to jail in the same vehicle as appellants, in violation of a separation order. Harvey said that appellants did not threaten Ezeokoli, "but ... have made it known to other people at the jail that [Ezeokoli] is testifying as a cooperator." As a consequence, Harvey said, "[o]ther people at the jail began taunting him and making comments ... [and Ezeokoli] was warned that when he comes back today ... there could be repercussions." Harvey then requested that Ezeokoli be transported back to the jail alone and "be removed from the jail altogether because it's now been spread to people in different units."

Appellants now contend that the sidebar discussion between the trial judge, Ezeokoli's attorney, and the prosecutor, outside the presence of appellants and their attorneys, violated their right "to be present at [an] important stage[ ] of trial" and also constituted violations of appellants' Sixth Amendment rights to counsel and to confront witnesses. Appellants assert that had they or their lawyers been present during the *ex parte* discussion, they would have asked to cross-examine Ezeokoli about potential bias resulting from the threats Harvey described. They also claim that the purported violations constituted structural error and thus require "automatic reversal." Because appellants' trial counsel were aware that there was going to be an *ex parte* conference and made no contemporaneous objection, we review these claims only for plain error. *See Kaliku v. United States,* 994 A.2d 765, 774 (D.C.2010). Thus, we will not reverse unless there was (1) error, (2) that was plain, and (3) that affected substantial rights, and (4) the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *Gilchrist v. United States,* 954 A.2d 1006, 1014 (D.C. 2008) (citation, internal brackets, and internal quotation marks omitted).

Appellants cannot show plain error, because neither the Supreme Court nor this court has ruled that *ex parte* conferences to address issues of witness safety are *per se* improper. Moreover, other courts that have considered the issue in similar contexts have ruled that such discussions may be permissible. *See, e.g., United States v. Adams,* 785 F.2d 917, 920 (11th Cir.1986) (concluding that "an *ex parte* conference to discuss threats against a witness [was] proper" because "no rights of the defendant [were] threatened," the substance of the witness's inculpatory testimony was

not discussed, and the conference was transcribed); *United States v. Arroyo–Angulo,* 580 F.2d 1137, 1141–42 (2d Cir.1978) (concluding that holding certain conferences and pre-trial proceedings *in camera* as a security measure did not violate defendants' rights because the record disclosed "no exclusion of any defendant from any closed proceeding which developed testimony later utilized against him at trial").

Moreover, even if we assume *arguendo* that exclusion of appellants and their counsel from the *ex parte* conference was error and that the error was structural, the relief that appellants seek still would not be warranted, because appellants have not shown that the purported error seriously affected the fairness of their trial or that the fourth prong of the plain error test is otherwise satisfied. *See Barrows v. United States,* 15 A.3d 673, 678 (D.C.2011) (acknowledging that "if [an error] is structural in nature, the defendant's substantial rights [which must be considered in the third prong of the plain-error test] will be deemed to have been affected, without need for further analysis in the context of the particular trial," citing *Arthur v. United States,* 986 A.2d 398, 413 (D.C.2009), but holding that the fact that a structural error "had some slight impact on the fourth-prong factors is not enough for a court to conclude that the fourth prong is satisfied"). The *ex parte* conference, which was transcribed, had nothing to do with the substance of Ezeokoli's testimony (the bulk of which, as the government points out, had been completed on the day before the conference). *Cf. Adams,* 785 F.2d at 920. Appellants have not suggested how the threats that Harvey described could have motivated Ezeokoli to give additional testimony *against* appellants.[3] In addi-

---

3. What transpired in this case is unlike the situation presented in other cases in which we

tion, we perceive no way in which cross-examination of Ezeokoli about the threats could have shown that Ezeokoli's testimony against appellants prior to the threats reflected bias against appellants. Indeed, defense cross-examination about the threats could have bolstered Ezeokoli's credibility by portraying him as a witness willing to testify despite threats to his safety, and could simultaneously have portrayed defendants as having made efforts to obstruct justice. Finally, the government made no mention of any threats against Ezeokoli during its questioning or closing arguments, and although Lucas's counsel speculated at oral argument about the "effect on the judge" of the information discussed during the *ex parte* conference, nothing in the record suggests that the court considered the information in connection with sentencing appellants.

**B.**

Appellants next argue that the evidence was insufficient to sustain their convictions. We review "such claims by viewing the evidence in the light most favorable to the prosecution...." *Lewis v. United States,* 996 A.2d 824, 831 (D.C.2010) (citations and internal quotation marks omitted). We will reverse only where the government "produced no evidence from

recognized that defense cross-examination of government witnesses who had been threatened by the *victim's* representatives could elicit evidence of bias in favor of the government and against the defendant. *Cf. Brown v. United States,* 952 A.2d 942, 948–49 (D.C. 2008) (holding that the defense should have been permitted to cross-examine a government witness about potential bias after a friend of the victim threatened the witness); *Hollingsworth v. United States,* 531 A.2d 973, 976, 979, 980 (D.C.1987) (holding that the defense should have been permitted to reopen testimony and cross-examine a government witness about potential bias where counsel had learned that the witness was threatened by the complainant).

which a reasonable mind might fairly infer guilt beyond a reasonable doubt...." *Florence v. United States,* 906 A.2d 889, 893 (D.C.2006) (citation and internal quotation marks omitted).

■ Lucas focuses particularly on the testimonies of Romney, Hamilton, and Ezeokoli, arguing that each man had "strong motivation to implicate him,"[4] and that their testimonies "contradicted and undermined each other." Specifically, Lucas asserts that "Ezeokoli swore that he planned the Georgetown ... robbery weeks in advance together with ... Romney and ... Lucas, while Romney denied he ever even met ... Lucas until the morning of the robbery." He also asserts that "Hamilton's testimony ... contradicted ... Romney['s] concerning assignment of roles purportedly made in Romney's Lexus just prior to the robbery, and division of proceeds afterwards."

■ While our review of the record discloses no real contradictions between Romney's and Hamilton's testimonies regarding the robbery participants' roles or the division of proceeds (and appellant has failed to identify any), Lucas is correct that the testimonies of Romney and Ezeokoli were inconsistent: Romney testified that he met Lucas for the first time the

4. To the extent appellants suggest that the testimonies of Romney, Hamilton, and Ezeokoli were inherently incredible because the three had entered into plea agreements with the government and thus were motivated to testify against appellants, we reject their contention. A cooperating witness's testimony is not inherently incredible simply because the witness entered into a plea agreement. *Cf. McCrimmon v. United States,* 853 A.2d 154, 165 n. 23 (D.C.2004) (holding that the trial court's denial of a motion for acquittal was proper because [as here] "the pleas were disclosed to the jury and issues of witness credibility are left to the jury").

morning of the Georgetown robbery and Ezeokoli testified that a couple weeks before the robbery he, Romney, and Lucas met for "a discussion about the Georgetown Jewelry Store." However, that single contradiction is not enough to overturn the jury's verdict. "[I]t is axiomatic, that as assessors of a witness'[s] credibility, the jury is always free to accept parts of a witness'[s] testimony and reject other parts. Similarly, contradictions among witnesses at trial are inevitable and are matters for the jury to resolve as they weigh all the evidence." *Koonce v. United States,* 993 A.2d 544, 551 (D.C.2010) (quoting *Payne v. United States,* 516 A.2d 484, 494 (D.C.1986) (per curiam)). Consequently, the contradiction Lucas highlights was a matter for the jury to weigh in assessing the believability of Romney and Ezeokoli, and did not render the evidence insufficient for conviction.

▬▬ Lucas argues that the evidence was insufficient to support his convictions of CPWL, UF, and UA because "no certificates or other evidence was adduced regarding his licensing or registration status," and that the evidence did not suffice for his PFCV conviction because "all evidence indicated that, even if [Lucas] was among those present during the robbery, he did not possess a firearm while crimes of violence were committed." However, as to Lucas's CPWL, UF, and UA convictions, the government's theory was that Lucas was an aider and abettor, not a principal, and the prosecutor presented evidence that Pellew, who, the evidence showed, carried the gun into the jewelry store, did not have a license to carry the gun. *See Walker v. United States,* 982 A.2d 723, 738 (D.C.2009) ("[T]o convict a defendant of CPWL, UF or UA on an aiding and abetting theory, 'the government must show that the principal (not the aider and abettor) was not licensed[.]'") (quoting *Halicki v. United States,* 614 A.2d 499, 503–04 (D.C.1992)). Similarly, Lucas's PFCV conviction did not depend on his having carried a firearm during the robbery, but rather on evidence that Lucas facilitated or encouraged Pellew's possession of a firearm during the robbery. In that regard, both Hamilton and Romney testified that they saw Lucas give Pellew a "chrome revolver," which Pellew then put "[o]n his waist" just prior to exiting the car and entering the jewelry store. Romney testified that Pellew was in possession of the gun while inside the store, and, after the robbery, Romney and Hamilton heard Pellew say that Pellew "didn't ... mean for the guy to get hurt." [5] The jury could infer from this evidence that Pellew shot Motai (and we therefore disagree with Pellew that the evidence was insufficient to support his PFCV and UF convictions), and that Lucas facilitated Pellew's firearm offenses (1) by giving Pellew the gun, which Lucas had brought with him from New York, immediately after the discussion about the role each man would play in the robbery, and (2) by acting as a look-out while the robbery took place.

▬▬ Pellew challenges the sufficiency of the evidence establishing that he was involved in a conspiracy to rob the jewelry store.[6] In particular, he argues that the

---

**5.** Pellew contends that this statement was inadmissible hearsay. While the statement was indeed hearsay, it was admissible under the exception for admissions of party opponents. *See Akins v. United States,* 679 A.2d 1017, 1030 (D.C.1996).

**6.** To prove the existence of a conspiracy, the government must produce evidence of
    (1) an agreement between two or more persons to commit a criminal offense; (2) knowing participation in that agreement with intent to commit the criminal objective; and (3) during the life of the conspira-

record is devoid of any evidence showing that he entered into an agreement with Romney, Ezeokoli, Hamilton, and Lucas to commit the robbery. He also asserts that "insufficient evidence was presented to demonstrate [that he] received any proceeds from the robbery." His argument is without merit. While no evidence was presented that Pellew engaged in the original planning of the robbery or that he vocally agreed inside the car to participate in the conspiracy, the government was not required to produce such evidence. A jury may infer the existence of an agreement from the participants' actions. *McCoy v. United States*, 890 A.2d 204, 214 (D.C. 2006) (inferring an agreement to conspire to commit assault with a dangerous weapon where one person drove the car while the other fired gunshots and shouted instructions). Moreover, "the agreement necessary for participation in a conspiracy may be near-instant[.]" *Castillo–Campos*, 987 A.2d at 484 (citation and internal quotation marks omitted). Furthermore, the government established that Pellew was in the car when the plan to rob the store was finalized; that he received a gun from Lucas, which he then carried into the store; and that he helped to subdue the store employees and shot the store's owner, while co-conspirators Romney and Lucas stole jewelry and money from the store. Such evidence was more than sufficient to show that Pellew agreed with the other men to commit the robbery. And, although it was not necessary for the government to prove that Pellew received some of the robbery proceeds, Ezeokoli testified that "a couple of weeks after" the robbery, Pellew "told [him] he sold some of" the jewelry from the robbery, implying that he had received a portion of the proceeds.

## C.

■ Finally, Pellew argues that he was denied a fair trial because the government elicited testimony from the arresting officer that Pellew did not react or say anything when he was arrested. During the direct examination of David Caskey, the FBI agent who arrested Pellew, the following exchange took place:

PROSECUTOR: [D]id [Pellew] react whenever you told him of the reason why he was being arrested?

WITNESS: No. There was no reaction.

PROSECUTOR: So he said nothing?

WITNESS: No.

PROSECUTOR: And how did he react physically?

WITNESS: I'm sorry, he was—

At that point defense counsel objected, and the court asked the lawyers to approach the bench. The court immediately asked the prosecutor, "What are you doing here[?] . . . You can't show that he said nothing." The court then proceeded to grant the relief requested by defense counsel, i.e., that the jury "disregard the witness's answer to the question about how Mr. Pellew reacted when he was told why he was arrested." Because Pellew did not ask for a mistrial or object that the corrective action taken by the court was insufficient, we review for plain error. *See Finch v. United States*, 867 A.2d 222, 226 (D.C.2005).

The record does not indicate whether Pellew had received *Miranda* warnings when he remained silent in the immediate aftermath of being informed by Agent Caskey that he was being arrested.

cy, and in furtherance of its objective, the commission by at least one conspirator of at least one of the overt acts specified in the indictment.

*Castillo–Campos v. United States*, 987 A.2d 476, 482 (D.C.2010) (citations omitted).

Whether he had been advised of his rights under *Miranda*—which appellant had the burden of clarifying, *see Teoume-Lessane v. United States*, 931 A.2d 478, 487 (D.C. 2007)—is important, since, although "no inculpatory reference can be drawn from an arrestee's decision to stay silent following *Miranda* warnings[,]" *Alexander v. United States*, 718 A.2d 137, 142 (D.C. 1998), neither this court nor the Supreme Court has decided whether it is constitutionally permissible for the government to elicit testimony that a defendant remained silent post-arrest but before he received *Miranda* warnings.[7] Thus, it was not " 'obvious' and 'clear under current law' " [8] that the government was not permitted to elicit testimony regarding a defendant's post-arrest, pre-Mirandized silence. Accordingly, even if the trial judge had not told the jury to disregard the testimony in question, on the record that is before us, we could not conclude that there was plain error. In addition, assuming *arguendo* that appellant had received *Miranda* warnings prior to the point in time when Agent Caskey informed him that he was being arrested, appellant has failed to show any residual prejudice he suffered from Agent Caskey's testimony that was not cured by the trial judge's curative instruction.[9] *See Hairston v. United States*, 905 A.2d 765, 786 (D.C.2006) (explaining that "the jury is presumed to have followed the trial court's instructions") (citing *Harris v. United States*, 602 A.2d 154, 165 (D.C.1992) (en banc)); *cf. Metts v. United States*, 877 A.2d 113, 118 (D.C.2005) (no prejudice where trial judge "instruct[ed] ... the jury [to] put [the improper testimony] 'out of your mind' ") (citation and internal quotation marks omitted).

For the foregoing reasons, appellants' convictions are

*Affirmed.*

7. The federal circuits are split on the issue. *Compare United States v. Love*, 767 F.2d 1052, 1063 (4th Cir.1985) (approving use of "testimony concerning a defendant's silence where the defendant has not received any *Miranda* warnings during the period in which he remained silent immediately after his arrest"); *United States v. Frazier*, 408 F.3d 1102, 1110–11 (8th Cir.2005) (en banc) (same); *United States v. Rivera*, 944 F.2d 1563, 1568, 1568 n. 12 (11th Cir.1991) (same), *with United States v. Hernandez*, 948 F.2d 316, 322–23 (7th Cir. 1992) (holding that the prosecution may not elicit impeachment testimony regarding the defendant's silence post-arrest but before he had received *Miranda* warnings); *United States v. Velarde–Gomez*, 269 F.3d 1023, 1028–29 (9th Cir.2001) (en banc) (providing that "once the government places an individual in custody, that individual has a right to remain silent ... regardless of whether the *Miranda* warnings are given .... [and] the government may not burden that right by commenting on the defendant's post-arrest silence at trial"); *United States v. Moore*, 104 F.3d 377, 385 (D.C.Cir.1997) ("[C]ustody and not interrogation is the triggering mechanism for the right of pretrial silence under *Miranda*.").

8. *Coates v. United States*, 705 A.2d 1100, 1105 (D.C.1998) (Ruiz, J., concurring) (citation omitted).

9. Also, during closing argument, the prosecutor did not mention Pellew's silence upon his arrest.